NATHANIEL W. CHURCHILL & others *vs.* GEORGE W. PALMER & others.

Suffolk.    March 13. — 14, 1874.    COLT & ENDICOTT, JJ., absent.
            June 18. — 25, 1874.    AMES & ENDICOTT, JJ., absent.

The authority given by the Gen. Sts. c. 115, § 6, to the Superior Court to report a case after verdict for determination by this court, extends only to questions of law. The report should be so framed as to state the nature of the case, and the questions of law intended to be reserved, and so much only of the facts or the evidence as may be necessary to present those questions.

The purpose of the St. of 1870, c. 312, providing for the appointment, by the Superior Court in the county of Suffolk, of stenographers, is to afford assistance to the court and the counsel in conducting the trial, and in drawing up reports and bills of exceptions, not that a complete record of all that took place in the court below, whether material or immaterial to the questions of law reserved, should be transmitted to this court.

A report from the Superior Court stated none of the rulings upon the admission and rejection of evidence, and upon the question reserved whether there was any evidence to be submitted to the jury, referred to the stenographer's report annexed, and this report as printed covered nearly two hundred pages, and consisted in greater part of irrelevant and unimportant details of testimony, long cross-examinations affecting only the bias and credibility of witnesses, and interlocutory discussions between the judge and the counsel, through which the rulings of the judge and the portions of the evidence bearing upon the questions of law to be determined, were scattered. *Held,* that the report was so irregular that it must be dismissed.

In an action against A. for a breach of warranty in the sale of goods, the plaintiffs introduced evidence tending to show that they made an agreement for the purchase

for a fixed price with a person representing himself to be an agent of A.; that by the terms of the agreement the goods were to be equal to a sample; that before closing the contract they saw A., who told them that they were buying directly of him and would get their bill direct from him; that no price or other terms were agreed on or mentioned between them and A., who received the price agreed upon by the agent and delivered the goods, but instead of giving a bill direct to the plaintiffs, gave them a bill to a firm of which A. had been a member, but which had ceased to exist, and a former clerk of this firm made out a bill of the goods from this firm to the plaintiffs, A. representing that this would make no difference. *Held*, that it was competent for the jury to find that A. adopted the contract of sale made by the agent, and that if so, A. could not repudiate the warranty, which was an essential part of the contract. *Held, also*, that the manner in which the bills were made out was open to explanation, and did not conclusively show that the plaintiffs bought of the agent.

CONTRACT on a warranty in the sale of a lot of kid gloves. Trial in the Superior Court before *Rockwell*, J., who made the following report:

" The pleadings and prior record of the case referred to. Defendants A. T. Hall, F. A. Hall and J. F. Macomber alone defended at this trial.

" The plaintiffs introduced evidence, documentary and oral; and this and the examination, and cross-examination of· witnesses, together with the proof offered by the plaintiffs and rejected by the court, and their exceptions thereto, and the evidence introduced by the defendants in the course of the plaintiffs' case, with the plaintiffs' objections and exceptions thereto, all appear in the notes and report of the same made by the official stenographer of this court, which is filed herewith, and adopted as true, and made a part hereof, the same as if incorporated herein as a statement of the facts.

·· The papers in the bankruptcy proceedings in case of Wm. H. Perley may be referred to in the original or certified copies by either party. They had been referred to in the examination of Mr. Thompson, who was to get and produce them; and they are to be treated as in the case. The counsel for the defendants, upon the close of the plaintiffs' case, made certain requests, which appear in said stenographer's minutes aforesaid; and, upon inquiry, said he should rest his defence there, and introduce no more evidence.

" The counsel for the plaintiffs objected to the case being taken from the jury, and to the court's ordering a verdict for the de-

fendants. In an oral presentation of his claims in matters of law and fact, he contended that the court should submit the case to the jury with appropriate instructions in matters of law, and that it was the province of the jury alone to pass upon the evidence and find the facts ; that there were several aspects or theories presented by the evidence, which, as the jury might find the facts to be, would entitle the plaintiffs to a verdict against one or more, or all of the defendants now defending, either upon the ground of warranty or fraud, or because no title was given to the property by the defendants or either of them, or for the whole or a portion of the money paid by the plaintiffs, upon a count for money had and received, or money paid.

" Among other claims or points, made in an oral discussion, covering the whole case in all the aspects of the evidence, the plaintiffs' counsel presented certain specific requests or propositions of law in writing, which, so far as they are material, are annexed hereto in copy, and are referred to. The court declined so to rule, and refused to grant them, ordering a verdict for the defendants aforesaid, as now defending, without allowing an argument to the jury, or submitting the case to them with remarks, and an opinion expressed, as appears in said stenographer's report, so far as material to this report, and which is referred to. The counsel for the plaintiffs inquired if any question was made as to whether Mr. Hall had the money in his hands at the time of the demand ; and if there was, he would like to add that fact. The court said that he did not think there was any question on that point, and said if he were to rule upon that, he should say that the evidence proved that. The counsel for the defendants made no admission about it and declined to do so, and said the point must stand upon the evidence. The jury returned a verdict for the defendants, as directed by the court, and the plaintiffs excepted to the refusals, directions of, and course pursued by the court. No specific or other objections to the pleadings were made by the counsel for the defendants or referred to by the court other than as appears by said report of the stenographer. And the plaintiffs' counsel has filed a notice or application in regard to the same, which is referred to.

" The case is reported after verdict to the Supreme Judicial Court, for their determination and direction upon the evidence,

exceptions of the plaintiffs and facts reported. If the presiding judge was in error, the verdict is to be set aside, and a new trial granted." The nature of the stenographer's report is stated in the opinion of the court.

*A. A. Ranney*, for the plaintiffs, read the report, and stated that it would not be necessary to read the evidence, as much of it was not material, and that in his brief he had referred to such parts of the evidence as he deemed essential to an understanding of the points of law. [GRAY, C. J. As you have admitted that much of the evidence reported is not material, the court first desires to hear you on the question why the case has been brought before us in this extraordinary form, with this mass of undigested testimony.] It was not deemed possible for the respective counsel in the case to agree upon what evidence was material, and the only way seemed to be to report the whole evidence, and for the respective counsel to refer to such portions of it as they considered material. At any rate, the judge of the Superior Court has seen fit to send up the report in this form. The statute allows a case to be sent to this court on a report. The judge ruled that the plaintiffs were not entitled to recover upon the evidence introduced by them. To this ruling the plaintiffs excepted. For the purpose of presenting the questions of law which arise, the evidence must be reported to this court. The manner of reporting it is the act of the judge of the Superior Court, and not the act of the counsel.

*G. A. Somerby*, for the defendants, was not called upon.

THE COURT then suggested that the case should stand over for a day, and that the counsel should see if they could agree upon an abridgment of the testimony on the coming in of the court.

On the next day the counsel for the plaintiffs stated that he had no further suggestions to offer.

GRAY, C. J. The authority given by statute to the Superior Court to make reports to this court extends only to questions of law. A report, like a bill of exceptions, should be so framed by the presiding judge, or by the counsel with his approval, as to state the nature of the case, and the questions of law intended to be reserved, and so much only of the facts or the evidence as may be necessary to present those questions to this court. The decision of the jury or the court below upon questions of fact or the weight of evidence is not open to revision here.

The purpose of the St. of 1870, c. 312,* providing for the appointment by the Superior Court in this county of stenographers to take reports of the evidence introduced and the rulings made and instructions given, is to afford assistance to the court and the counsel in conducting the trial, and in drawing up reports and bills of exceptions ; not that a complete record of all that took place in the court below, whether material or immaterial to the understanding of the questions of law reserved, should be transmitted to this court.

The report signed by the presiding judge in the present case states none of the rulings upon the admission and rejection of evidence, but merely refers for them to the entire record of the stenographer, through which they are scattered.  The remaining question reserved is whether there was any evidence to be submitted to the jury upon the principal issues in the case.  The stenographer's record, as printed, covers nearly two hundred pages, and consists, in greater part, of irrelevant and unimportant details of testimony, long cross-examinations affecting only the bias and credibility of witnesses, and interlocutory discussions between the judge and the counsel ; and leaves it to this court to sift out from this large volume of worthless matter the several rulings of the judge and the comparatively small portions of the

---

* The material provisions of this act, which is entitled " An act for the preservation of evidence in certain cases in Suffolk County," are as follows :

" SECTION 1.  The judges of the Superior Court, or a majority of them, shall appoint two stenographers to serve as hereinafter provided, at the terms of said court held for civil business within and for the county of Suffolk, who shall be sworn officers of said court, and who shall each receive an annual salary of two thousand dollars, to be paid by the said county of Suffolk.

" SECTION 2.  Whenever in the trial of any action in said court for said county, both parties to the same shall agree in writing that a stenographic report of the evidence, or of the charge of the presiding judge, or of any part of the proceedings, shall be taken, or whenever, upon the application of either party to an action, the presiding judge shall deem it advisable that a stenographic report of any part of the proceedings shall be taken, it shall be the duty of the stenographers so appointed to cause full stenographic notes to be taken of such proceedings, or any part thereof which may be so required ; and it shall further be the duty of the said stenographers to furnish to either party to such action, upon request, a transcript of such part of the notes so taken as may be required."

evidence which have any bearing upon the questions of law to be determined.

Such a manner of reporting a case, while it puts the parties to needless expense in the preparation of copies, fails to present with adequate clearness and precision the legal questions upon which this court is to pass. The record now before us affords so extraordinary an example of irregularity in this respect, that it cannot, consistently with a due regard for the orderly and intelligent administration of justice, be entertained in its present shape. It will be open to the plaintiffs to apply to the judge who presided in the Superior Court for a report in proper form of the questions of law which were reserved at the trial.

This question of practice being an important one to the rights of parties in this and other cases, opportunity was given to the counsel to be heard upon the subject, it has been deliberately considered during the adjournment, and the opinion now announced is the unanimous judgment of the court.

*Report dismissed.*

The case subsequently came before the court on a report of *Rockwell*, J., in substance as follows, so far as it relates to the questions decided :

The suit is brought to recover either the money paid by the plaintiffs to the defendants, or damages for breach of contract and warranty in the sale and purchase of seven cases of kid gloves.

The plaintiffs introduced William H. Perley as a witness, but contending that, as he was a defendant, though defaulted, they being obliged to use him, would not be bound by his testimony, if it was contradicted by other testimony, or not believed; and from his testimony,* it appeared that Rogers Bros. & Co. of

---

* The St. of 1869, c. 425, § 1, provides that : " The party producing a witness before any court, as well criminal as all others, or before any person having by law or by consent of parties authority to hear, receive and examine evidence, shall not be allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony ; but before such last mentioned proof can be given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he has made such statements, and if so allowed to explain them."

Naples, through John Munroe & Co., at Paris, in the early spring of 1870, consigned for sale several cases of kid gloves to the defendant Andrew T. Hall, which had been originally designed and intended for Bigelow, Peyser & Co. of Boston, then pecuniarily embarrassed, and who for years had been glove importers and dealers; that the defendants F. A. Hall and John F. Macomber were copartners, and had their place of business in the same office with said Andrew T. Hall, but were not connected in business with him; that Macomber, as partner of F. A. Hall, in April, 1870, in behalf of Andrew T. Hall, verbally agreed with the defendant Perley, who for years had been a copartner of Bigelow, Peyser & Co., and was then doing business solely as glove dealer, under the name of Bigelow, Peyser & Co., after an examination by said Perley of two of said cases of gloves, which were perfect in every respect, to sell him eleven of said cases of gloves, at six dollars per dozen, to be perfect in every respect, equal if not better than the two cases examined, to be paid for, cash on delivery, two of the cases to be delivered and paid for on or before May 10, 1870, and the remaining cases on or before September 1, 1870, and in mean time, before delivering all said cases of gloves, Andrew T. Hall was to retain possession of said gloves. Perley then knew that the gloves had been originally designed and intended for said Bigelow, Peyser & Co.

The plaintiffs introduced evidence tending to show that they constituted the firm of N. W. Churchill & Co. at the time of the transaction in question; that they bought of Perley, in the last of April or first of May, 1870, two cases of kid gloves, which were delivered to them billed in the name of Bigelow, Peyser & Co., and paid for by them at the price of seven dollars a dozen; that subsequently they entered into negotiations with Perley for the sale and purchase of nine cases more; that the said two cases were bought by sample and specifications, and answered the contract; that in negotiating the sale of the other nine, Perley represented that he was not the owner, but was selling them for somebody else, a responsible party, whom he refused to and did not name; that he agreed to sell them to the plaintiffs, by sample and specifications, which were given to them and which they were to answer, and they were to be, when delivered, as good

as, if not better than the other two cases previously sold and delivered as aforesaid, and which were of high quality and perfect, the price to be seven dollars a dozen, and the goods delivered at any time within four months, which would be about the first day of September, 1870, with payment on delivery; that they knew Perley was not responsible, and would not have relied on him, and after the agreement had been made, or the plaintiff Churchill had concluded in his own mind to take them, and the terms settled between them, insisted that before they would buy them they must know of whom they were buying; that said Perley then, about ten days before September 1, told them that Andrew T. Hall, old Honesty himself, was the owner, and he was selling for him, which was satisfactory to the plaintiffs; but that N. W. Churchill, one of the plaintiffs, for the purpose of assuring himself, went to see A. T. Hall, and this interview occurred, to wit; as testified to by the plaintiff Churchill:

" I went to his office, and inquired for A. T. Hall. I never saw the man before. He was pointed out to me, and came along and spoke to me very politely. I told him I had come to see about the lot of gloves that Mr. Perley had something to do with, and had talked to me about. He said to me, ' Those gloves are sold, sir.' I said to him, ' Perhaps I am the party who has bought them. My name is Churchill.' ' Oh, yes,' said he, ' that is the party, that is all right.' I told him I was ready to take the goods on the 1st of September. That was the time that was assigned for the delivery of the goods. I said I should be ready to take them; he said, Very well; he would go to work and have the goods entered, and take them out as soon as possible, and deliver them to me; and he said in the mean time that there were some of them in New York; he would have to send to New York and get them here. I told him I would like to have him do so as soon as possible; that we had got ready to take them, and wanted the goods; he said he would do it; and everything was satisfactory. I said to him then, ' Who do I buy these gloves of?' He said, ' You buy them of me.' ' Do I get a bill from you?' ' Yes, you get a bill direct from me.' That is about all that was said to Andrew T. Hall at that time, that I remember."

That Churchill had a second interview with said Hall, which he testified to as follows, to wit: " A. T. Hall was there, and his brother, Frank Hall. I went down and told him I came after the bill of the gloves, and wanted to know just how much to draw a check for. He turned to his brother, and said, ' Make a bill of those goods to Mr. Churchill.' Mr. Hall turned round, and said, ' We cannot make a bill to Churchill ; we must bill these goods to Bigelow, Peyser & Co.' Andrew T. Hall said to him, ' You have had the management of this whole affair ; you may fix it up to suit yourself,' or words to that effect. Then I said to Mr. Hall, ' Is it going to make any difference to me whether these goods are billed direct from you, or through Bigelow, Peyser & Co. ? ' ' Not the slightest,' he said. Then I took this bill and carried it to Perley's office. McBrian was there. He was formerly connected with Perley ; but I did not know what his connection was then. I handed him that bill ; and I said, ' There is the bill of those goods ; and you had better copy that bill, except changing the names.' He did so ; and I went up-stairs, and Mr. Dam drew a check for the amount. I took the check, and McBrian and I went down to the office. I passed the check to Frank Hall, and he receipted Bigelow, Peyser & Co.'s bill, and Mc-Brian receipted my bill. Then some one took that check, either McBrian or Frank Hall, and went into the bank with it. Then I had some conversation afterwards with Macomber about the delivery of the goods. The goods were in his office. Then I said to him, ' We want these goods this afternoon. It is past your office hours ; will you wait here ? ' He said, ' Oh, yes, we will wait until you send for them ; ' but he wanted me to send as soon as I could. That when he went to Macomber's office with the bill, he told what had been done and what Mr. Hall said, and told him he had better keep that bill."

That in none of these interviews was anything said about, or intimated, that the defendants had sold the gloves to Bigelow, Peyser & Co., or to Perley.

That the plaintiffs had had some of the same kind of gloves before, that were damaged, and in one of these interviews, he thinks the first, after the conversation with said Hall, he had some talk with Macomber, in which he asked him, " What if these goods are damaged ? " He answered, " You must look to

the parties you are buying them of." And that, as they had just been told it was Andrew T. Hall, this was satisfactory to them ; that the check was dated September 3, 1870, drawn on the Bank of the Metropolis, against funds payable to the order of A. T. Hall, and was paid, and came back in course of business, paid, with said Hall's indorsement on it ; that the check was delivered about two o'clock, P. M. ; that the defendants had promised to have the goods sent to them directly from the custom-house, to save two cartage expenses ; but they were not, but taken to the office occupied by A. T. Hall and Hall & Macomber ; that the plaintiffs did not examine, or have an opportunity to see and examine the goods, before delivery, except the samples, and were not asked and did not ask for leave to do so ; that the plaintiffs, after delivering the check, went to their own office, drew an order directed to A. T. Hall or Hall & Macomber, sent it by a teamster, who was directed, and did go to the defendants' office with it, and obtained seven cases of kid gloves on it there, and carried and delivered them to the plaintiffs' office, directly after said payment.

That the plaintiffs, as they testified, did not know, and had not been told, of any prior sale or bargain between Hall and said Perley, or Bigelow, Peyser & Co., and no reason was given why F. A. Hall was to, or did, make out a bill to Bigelow, Peyser & Co., or in their name, instead of directly to the plaintiffs; that one of the plaintiffs, Dam, knew, or had heard of Perley being a bankrupt at the time ; that the gloves delivered were in cases, packed in cartoons and in boxes lined with zinc ; that upon the delivery of the gloves, the boxes were opened directly on the same day, and all of them, without the exception of a single case, were found badly spotted and damaged, not answering the samples and specifications, and the contract and warranty aforesaid.

Evidence was also introduced tending to show an offer to return the goods to the defendant A. T. Hall, and a refusal on his part to receive them.

It appeared that, at the time in question, there was an established custom or usage to sell cases of gloves by sample, among and known to the trade, and that importers of gloves were accustomed to have samples and specifications of gloves sent in advance of the cases in bulk, to sell by, and that this was the cus-

tomary and usual mode of sale when gloves were sold in cases or bulk, and no opportunity afforded for examination.

The plaintiffs introduced evidence showing that after Perley stated that A. T. Hall was the owner of the goods, and Churchill went to him, the plaintiffs had nothing to do personally with Perley, but dealt entirely in relation to the gloves with A. T. Hall, or Hall & Macomber; that A. T. Hall, at the time of the demand and offer to return the goods, held the said check undrawn, and continued to hold the funds thereafter, for aught that appeared; that Perley came into the plaintiffs' office and saw the gloves the week next following September 3, and was told by the plaintiffs that they had offered the gloves back to Mr. Hall, and had demanded back the money.

The plaintiffs called and examined Perley, and his evidence in chief was, in addition to that already stated, that his attention was called to some cases of gloves by A. T. Hall and Macomber; that he was shown some samples by them in their office; that he was solicited to buy them; that Macomber went with him and Palmer to the custom-house, and showed them two cases, which they examined and found to be of a good quality, and perfect in every respect; that it was stated by Macomber that the others were and should be when delivered, as good as these, if not better, and perfect in every respect; that they did not see, and were not shown the others; that they were not there, they having come, or were coming, in different steamers; that in April, he negotiated a trade for some ten or eleven cases, at six dollars a dozen, two cases to be taken in ten days, and the balance by the first day of September; that he took the two cases seen, billed to him in the name of Bigelow, Peyser & Co., paid for them at the price of six dollars a dozen, and these he sold and delivered to the plaintiff at the price of seven dollars a dozen, and billed them in the name of Bigelow, Peyser & Co.; that the rest were to be at same price, to be kept by Hall and delivered at any time within four months, and be like the samples and specifications given him, and equal, if not better, than the two cases seen, and perfect in every respect, when delivered; that he did not see the others; that he told Macomber or Hall that he should take them, and likewise, that he was going to dispose of them, as he did not wish them to compete with his goods in the market, and wished

to control them, and thought he knew a party who would buy them ; that they gave him samples and specifications of them ; that after selling and delivering the said two cases to the plaintiffs, he negotiated with them for the sale of nine cases more, and gave them the specifications which Macomber had furnished him, told Macomber that he wanted them to show, and did show them, to Churchill, and finally, in June, he thought he concluded the trade with the plaintiffs, verbally, by the samples and specifications given him by the defendants, agreeing that the rest, when delivered, should be as good as, if not better than the said two cases, and perfect in every respect, using about the same language as Macomber used to him, the price to be seven dollars a dozen, cash ; that after he was in bankruptcy, the plaintiff Churchill came to him direct, and asked him about the goods, and he told him that they belonged really to A. T. Hall, and that it dropped there ; that from that time forward, the plaintiffs did not deal with him, and he did not see Churchill, or Hall, or the other defendants about them after that time ; that he sent some word to Hall, by McBrian, which he was proceeding to state, but did not, on defendants' objecting to his doing so ; that he had nothing to do with the matter after that, in any way ; that the goods were never delivered to him, and he never paid or received any money on account of them ; that defendants never paid or offered him any portion of the money received from the plaintiffs, nor the difference of one dollar a dozen between the price which he was to pay and the price to be paid by the plaintiffs ; that he was not in town on the last day of August, or September 1 or September 3 ; that on the following Monday he saw the goods, and the plaintiffs told him that they had taken them Saturday, got them of Hall ; was called in to look at them, and saw them in this bad condition ; that samples of the whole were given to him when he bargained for them ; that he knew nothing about the bill given by defendants running to Bigelow, Peyser & Co., at the time, and never knew of it until he found it among his papers at the office, a long time afterwards ; that he never took delivery of the goods, and there was at the time no Bigelow, Peyser & Co., and no one was doing business in that name ; that during the summer, shortly after he had sold these two cases, he sent to Hall to have one or two cases sent up to his office, and, on examination, would

pay for them ; that they objected, and he did not get them ; that in August·or September, he judged that they might be damaged, as he had sold, along in June, some goods of his own at the custom-house, of the same class, but they proved to be bad; that after seeing the goods on said Monday, he did not go to see the defendants about them ; that he had notice of the offer to return the goods, and of the demand to and of Hall; that he (Churchill) was dealing with Hall, and he supposed he had no claim on him whatever.

On cross-examination, he stated that from April 25, 1870, up to the time when this suit was brought, he did not communicate with A. T. Hall, except that he sent verbal messages down to him by McBrian ; that A. T. Hall never told him to sell these gloves, nor to sell them to anybody, and to warrant them, to his knowledge ; that he was not the agent of F. A. Hall, or of Macomber ; that, if he sold the gloves, he sold them on his own account; all he wanted was his commission, one dollar a dozen ; that he had no money to get them himself, and had got to look between these two parties to get them ; that in using the word commission, he meant the difference in price between what he paid Hall and what Churchill was paying him; that he did not mean that A. T. Hall was going to give him a commission for selling them.

He testified that he knew nothing about the bill given Bigelow, Peyser & Co., dated Sept. 1, 1870 ; never knew it was made out ; never authorized it in any way, shape, or in any form ; never knew there was any such a transaction, nor about the bill, until long afterwards.

L. B. Thompson testified for the plaintiffs, that he was assistant clerk in the United States Bankruptcy Court; that a petition was filed by a creditor against Wm. H. Perley, July 7, 1870, and proceedings had thereon, and an adjudication·made and warrant issued on July 23, 1870 ; an assignee was appointed October 1, 1870.

At the close of the plaintiffs' testimony, the defendants put in no evidence, and contended that the plaintiffs could not recover on their declaration, and rested their defence there. The plaintiffs' counsel contended that the evidence was for the jury ; that .t tended to prove either that defendants sold the gloves to the

plaintiffs with a contract and warranty not answered; or that, if there was a bargain for a sale to Perley, in the name of Bigelow, Peyser & Co., it was not carried out, but abandoned; and that the defendants assumed and adopted the sale to the plaintiffs made by Perley, and carried it out as their own; that no title passed to the plaintiffs, on account of the bankruptcy proceedings, if there was any bargain and sale to Perley; that the plaintiffs were either entitled to recover damages for breach of contract or warranty, or the money and funds paid in whole or in part.

Upon the defendants' motion and request, the presiding judge held and ruled, as matter of law, that there was no case made out under the pleadings, and refused to submit the evidence to the jury, directing a verdict for the defendants. No specific objection was made or named to the declaration; but the defendants' counsel contended, and the court ruled generally, that the plaintiffs could not recover upon the pleadings and the evidence.

*A. A. Ranney*, for the plaintiffs.

*G. A. Somerby*, for the defendants.

MORTON, J. There was evidence on which it would be competent for the jury to find a verdict against A. T. Hall upon the ground of a warranty of the goods sold. It tended to show that the plaintiffs negotiated a purchase of the goods with Perley, who represented himself to be the agent of Hall; that a part of the contract was that the goods should be equal to the sample; that before closing the contract the plaintiffs called on Hall, who told them that they were buying of him and would get their bill direct from him. No price or other terms of sale were agreed on or mentioned between the plaintiffs and Hall, but he received the price fixed by Perley and carried out the contract made by him. It was competent for the jury to find that Hall adopted the contract of sale made by Perley as his agent. If so, he could not repudiate the warranty, which was an essential part of the contract.

The mode in which the bills of parcels were afterwards made out tended to contradict the plaintiffs' testimony, but this was open to explanation, and did not conclusively show that the plaintiffs bought of Perley. We think the evidence should have been submitted to the jury. As there must be a new trial, it is un-

necessary to consider whether there was evidence for the jury upon the count charging a fraudulent conspiracy of the three defendants.                                    *Verdict set aside.*